ENRIQUE GARRIGA BENGOA, Appellant, *v.* INDUSTRIAL COMMISSION OF PUERTO RICO, ETC., Respondent.

No. 605. Decided March 11, 1963.

*José A. Suro, Antonio José Amadeo,* and *Antonio José Amadeo, Jr.,* for appellant. *M. Orraca Torres* counsel for beneficiaries of the deceased workman.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

The relatives of José A. Arroyo appealed to the Industrial Commission seeking compensation from appellant Enrique Garriga Bengoa. They alleged that Arroyo sustained a labor accident while working for appellant taking care of his truck and that he died as a result thereof. After proper steps were taken and hearings held, the Industrial Commission ruled that the deceased had sustained an accident in the course and as a result of his work while performing a function inherent therein and while working for his em-

ployer Enrique Garriga Bengoa, who was an uninsured employer, wherefore the latter was liable for the laborer's accident. It ordered the Fund Manager to liquidate the case and collect from appellant the compensation plus expenses, and to pay the same to the beneficiaries. In support of its decision, the Industrial Commission made the following findings:

"The evidence introduced by the beneficiaries deserved full credit and it discloses the following:

That employer Enrique Garriga Bengoa is engaged in the land transportation business and did not carry insurance with the State Fund covering the risk.

That on or about December 3, 1959 a truck owned by him operated by Rufino Delgado Escuté, who worked on a percentage basis, broke down on the military road near the slaughterhouse.

That when the truck was standing in the middle of the road, Barnés, brother-in-law of Garriga Bengoa, owner of the truck, passed by the road and upon learning that it was the truck of his brother-in-law's brother, he tried to reach him by telephone in Coamo, where Garriga Bengoa lived but could not reach him directly. That he was able to locate him later and Garriga asked him to call Puerto Rico Iron and ask them to remove the truck with a hoisting machine from the place where it was standing.

That they were unable to get a hoisting machine, and Barnés together with Luis Álvarez went to Bayamón to get the hoisting machine, but were unable to do so because it had no lights. That they arrived at the place of the occurrence and the police was there.

That the chauffeur of the truck, after turning on the lights, left for his home in Trujillo Alto to have dinner, planning to return to the place where the truck was standing, but did not return.

That Luis Álvarez offered to sell to Barnés a differential for the damaged truck, but the owner of the truck did not appear and the deal was left pending.

That Barnés asked if anyone could stay and take care of the truck, which laborer José Antonio Arroyo, who was around

there, agreed to do for $10 and that he would stay there until 6:00 a.m.

That while Barnés, Arroyo and Álvarez were talking close to the truck, an automobile went past them and ran over Luis Álvarez and José Antonio Arroyo Rodríguez causing the latter's death.

"We have no doubt at all that Barnés was acting as an agent for Enrique Garriga Bengoa, his brother-in-law, and that at the time of the accident José Antonio Arroyo Rodríguez was performing a duty for employer Enrique Garriga. We do not believe that the laborer could offer his services until 6:00 a.m. merely out of cooperation.

"From an analysis of the witnesses' testimonies we conclude that José Antonio Arroyo was employed by uninsured employer Garriga; that he contracted the services of José Antonio Arroyo to take care, watch and guard Garriga's damaged truck, and that the accident occurred in the discharge of his duties.

. . . . . . . .

"We also agree with claimants that the work performed by laborer José Antonio Arroyo at the time of the accident was for the benefit of uninsured employer Enrique Garriga Bengoa, who was at the time an employee of said employer, and that this case comes within emergency acts.

. . . . . . . .

"We can not consider a mere volunteer to be an employee; however, in an emergency the volunteer may become an employee. In the case under consideration there was more than a voluntary act; there was a request by the employer's agent to guard the truck, the compensation for which service would be $10. The evidence introduced by the beneficiaries fully established this point.

. . . . . . . .

"In other parts of this decision we have used the term 'agent' in referring to Barnés, and we believe that Barnés was in fact acting in that moment as an agent and/or representative of Enrique Garriga Bengoa, since in addition to the fact that the employer himself employed the term, his action also proves it. Barnés received instructions to guard the employer's property, namely, the truck which had broken down in the middle of one of the busiest highways of Puerto Rico such as road No. 2."

Reconsideration of the decision having been sought, the Commission, this time with the dissenting vote of Commissioner De Jesús Mangual, ratified the same. The case is before us on review.

The statement of facts which the Commission found proved is substantially supported by the record. It seems, however, that the statement does not contain a full recital of all the circumstances surrounding the case for making a determination on the labor-management relationship between the deceased and appellant whereby he is bound to compensate, since he is an uninsured employer. This labor-management relationship depends in turn on the determination whether the person who hired the laborer was an agent of appellant who could in law bind him by his acts.

■ According to § 11 of the Workmen's Accident Compensation Act—No. 45 of April 18, 1935 (Sess. Laws, p. 250)—review by this Court may be granted only on questions of law, or upon appreciation of the evidence when such evidence is of an expert nature. In view of the peculiar situation presented in this case, the finding on the existence of a labor-management relationship is in the last instance a dual conclusion of fact and of law. Consequently, the legal effect which the Commission attributed to the facts which it found proved and which were aimed at establishing such labor-management relationship, is reviewable as a matter of law. *Montaner* v. *Industrial Commission*, 54 P.R.R. 686; *cf. Ortega* v. *Industrial Commission*, 73 P.R.R. 184. *Cf. Comm'r of Education* v. *District Court; Feliciano, Int.*, 74 P.R.R. 306, 319; *Sanabria* v. *Heirs of González*, 82 P.R.R. 851, 962.

The only evidence on the facts alleged by claimants was the testimony of witness Luis Álvarez, to whom the Commission gave full credit. When he came out from work around three o'clock, he passed in front of Brugal on the Bayamón road and saw appellant's damaged truck. The chauffeur told him that the vehicle belonged to a person from

Coamo. The differential of the truck was broken and the witness had one which he wanted to sell to the owner. The witness left and returned to the place about seven o'clock in the evening. He asked the chauffeur if the owner of the truck had come and he answered that he had not, but that there was one around there who said that he was the owner's brother-in-law. Arroyo, the deceased, was at this time hanging around. The witness located the brother-in-law (Barnés) and they talked. Álvarez' testimony on Arroyo's employment was this: "He, as he was the brother-in-law of the truck owner, tried to remove the truck and repair it if possible." Barnés and the witness went to Bayamón to get a hoisting machine to remove the truck, but were not able to get one. "Q. Did you hear Barnés and Arroyo talking? A. Yes, sir.... He asked him to stay and watch the truck... A. Then he asked him: And who is going to pay me? Q. Who said that? A. The deceased. And he said to him: 'My brother-in-law is coming tonight or tomorrow.' Since I [the witness] knew the young man, I said to him: 'You watch the truck and if he does not come in the morning I'll pay you the money and I collect from him in the morning.' I had some business to do and I was waiting for the owner of the truck to come."

The witness then testified that he and Barnés went to a business place 30 meters away from the place and Barnés spoke on the telephone to his brother-in-law. He accompanied Barnés because he had a differential which he wanted to sell and which could be used in the truck. On the accident: "Q. When Barnés and I returned from Hato Tejas, we agreed that Bengoa was not coming. We talked for some time to see if he would show up because I was hoping that he would come. [Com.] Q. That who would come? A. Barnés was hoping that Bengoa would come, but when he realized that he was not coming he said to me: 'I'm going home to sleep and tomorrow he will decide what to do with the young man.' At that moment Arroyo told me that he had not had

supper. . . . Q. What did you do then? A. Arroyo asked me for money to eat. . . . Q. When he said that to you and when he asked you for that, what did you do? A. I gave him the money and he asked me to help him with a light, and as we were lowering the light in order to turn it on, the car appeared suddenly and after that I know nothing else. He was going to have dinner later, and I had aligned the truck and was going to watch it until he returned. Q. Who left José Antonio there watching the truck?. . . . A. Barnés left him there watching the truck". . . . [Com.] "Witness, tell slowly what the policeman said and what Arroyo said and what Barnés said. A. I'm going to explain. Since we were trying to remove the car, that is, the policeman gave him 15 minutes to remove the car. Barnés then said to the policeman: "I'm going with this man, who told me that he could get a hoisting machine (and he was referring to me) to remove the car out of the way.' The chauffeur said to him: 'I'm leaving.' The policeman then said: 'In the meantime leave the car there guarded.' Barnés asked if anyone could stay to watch the car and Arroyo, who was present, said: 'I can stay and watch the car.' And Arroyo then said: 'And who is going to pay for this?' Barnés said: 'If the brother-in-law comes, he will pay you, and if he does not come, I'll pay.' I said: 'Stay, if he does not pay you, I'll pay you tomorrow; I'll see if the owner of the truck comes tomorrow to sell him the differential.' I said: 'Tomorrow I will tell him that Barnés left you watching the truck and that I paid you.' It was then that we went to see Antonio Guadarrama about getting a hoisting machine." The witness also testified that Arroyo worked as heavy-equipment operator, that he did not hear Barnés' telephone conversation with his brother-in-law, and that Arroyo had asked $10 for watching the car until 6:00 a.m., and that he had to leave for his work at 8:00 a.m. The witness was injured together with Arroyo, and

regained consciousness 12 days later in the hospital where he was confined one month.

The record discloses other uncontroverted facts which do not conflict with Álvarez' testimony and which, if found not to be unreal and untrue in themselves, or if the witness is not impeached, should be considered together with the others. *Cf. Comm'r of Education* v. *District Court; Feliciano, Int., supra.*[1] No business or labor relations of any kind existed between Barnés and appellant. They were only brothers-in-law. Barnés happened to see the damaged vehicle about 3:00 p.m. It looked like appellant's vehicle and the chauffeur confirmed it. One hour later, upon his return, he stopped and the chauffeur asked him to call Garriga in Coamo. He spoke with him the second time he called about 5:00 p.m., and Garriga asked him "to call up Puerto Rico Iron, that they would remove the truck from the place, which he did. . . . He asked me to take care of the truck, to remove it from the place, that Puerto Rico Iron would take charge." He did not give him any other instruction. At 6:00 p.m. he returned to the place to see whether the truck had been removed, but it had not. This time he found Álvarez, who talked to him; he said that he was not the owner, but the former insisted on selling him a spare part. He went away and returned after seven o'clock. Álvarez was there insisting on selling him the part. He saw Arroyo there. He went with Álvarez to Bayamón to get a hoisting machine to remove the truck, but did not find any and returned to the place. He called Coamo again from the business place which Álvarez had mentioned, and Garriga "again asked him to do everything possible to remove the truck from the place." When the accident occurred the chauffeur had already left. Arroyo, Álvarez and he were standing in the

---

[1] In cases calling for determination of the status of uninsured employers, § 15 of the Act provides that the Commission shall give the workman and the employer an opportunity to be heard in their defense, following as far as possible the practice observed in the district courts (now Court of First Instance).

form of a triangle, at talking distance. He could not say whether Arroyo was fixing a light "because at that moment I turned around and was able to save myself."

The chauffeur lived in Trujillo Alto and he worked alone in the truck on a percentage basis. He remained at the place until six, he asked the police patrol if he could leave because he had already turned on the required lights, and they said he could. The police did not ask him to leave any watchman there. Barnés was not there when he left. The witness was going home to have dinner and then return. At nine o'clock he tried to, but could not get transportation to come to the place. Before leaving he and another person prepared five flares or lights and left them on the truck, and also the required light. Barnés was not there at that moment.

Appellant testified that when Barnés informed him of the truck breakage, he asked him "to try by all means to remove the truck; to call up Porto Rico Iron, that they had hoisting machines for removing heavy equipment." He did not give him any other instruction. Only the chauffeur worked on the truck on a 25 percent basis. It also appears from the record that the deceased was a heavy-equipment operator who earned a minimum of $1.25 an hour and had permanent work. He was not habitually engaged as a caretaker, guard or watchman.

In view of the manner in which the facts developed, which had not been previously calculated in the making of an employment contract, as well as all the other surrounding circumstances, the evidence does not support persuasively the existence of a labor-management relationship *created* by fact and by law by appellant, either directly or indirectly or impliedly, through an authorized agency. That such was not appellant's intention is confirmed by the fact that Barnés' entire intervention, although unsuccessful, was aimed at removing the vehicle in accordance with the instructions given him. As to the transaction with Arroyo, the evidence

makes one ponder whether Barnés' initiative or intervention, or rather that of witness Álvarez, who had some interest, was actually the most controlling.

Under the applicable general agency principles, it seems that Garriga did not have in mind the solution of the situation so as to require authorization to engage the services of a person to watch the vehicle on the street, thereby becoming an employer knowing that he was not insured. On the two occasions in which he intervened, he insisted that the vehicle be removed promptly from the place by an entity which he knew had the equipment needed, so that the truck would not remain there. Conceding, as did the Commission, that Barnés procured or agreed to hire the services of the laborer, the owner at no time prior to the accident had knowledge of such action. *Cf.* § 1792 of the Civil Code (1930 ed.) : "The ratification of the management by the owner of the business produces the effects of an express authorization." See §§ 1605, 1610 and 1618. *Cf. Gordils et al. v. Sucs. of Frontera, Ltd. et al.*, 21 P.R.R. 213; *López Landrón v. The Registrar of Property*, 15 P.R.R. 703; *Lókpez v. Lókpez*, 61 P.R.R. 596, 599; *Font v. Registrar*, 57 P.R.R. 635, 637; *Labor Rel. Board v. Cía. Popular*, 77 P.R.R. 1, 7.

We are conscious, as we have traditionally held, that the workmen's accident compensation statute should be liberally construed in favor of the laborer whom the law has sought to protect. The statute itself provides in § 2 that any reasonable doubt that may arise as to its application with regard to the existence of causal relation between the work or occupation of the workman or employee and the injury, disability or death, or the occupational character of a sickness, shall be decided in favor of the workman or employee, or his beneficiaries. Recently we had opportunity to apply this provision in its full extent and meaning in *Feliciano v. Industrial Commission*, 84 P.R.R. 188 (1961) and *Meléndez v. Industrial Commission*, 85 P.R.R. 54 (1962). Both cases are typical of the causal relation between the injury or death

and the employment, without the employment itself being in issue.

However, the problem presented in this case goes even farther. It is not a question of resolving doubts, within the insurance system itself, as to whether or not there is *causal relation* between the work and the injury or the death, which experience has shown covers a broad field of conflicting expert and nonexpert criteria. The problem before us is rather whether or not a labor-management relationship was created in law which made appellant an uninsured employer, with the consequences which it entails. In the peculiar situation of this case, the sections and principles cited above on agency or authority have even more efficacy. The agent's action, if not authorized or ratified, not only subjected the principal in this case to a pecuniary liability within a special law system without the defenses which he would ordinarily have in a regular civil action for damages, or of performance of an obligation, but also made him a punishable delinquent— § 17 of the Act—giving him a status of employer in violation of the statute.

██ The applicable emergency work doctrine does not decide this case on the circumstances therein. There should always exist, in principle, a juridical nexus to connect the presumptive employer with the liability which the law imposes on him, as would be the typical case of an employee or agent who in the discharge of the employment confronts an emergency or unexpected situation, and who in order to safeguard the interests of his employer or in order to face the situation hires or uses the services of another person. It has been held that in such event the employee's action would not be so removed from the functions of the employment as not to create a labor relationship with the third person. At any rate, the circumstances, the degree of emergency or hazard, the need for the action taken, the probability or not of communication with the employer and any other circumstances, should always be taken into consideration. As-

suming that the employer-employee relationship existed between the chauffeur of the truck and appellant, the victim's services were not procured by the chauffeur nor in his presence. *Cf.* LARSON, Workmen's Compensation Law 699, § 47.42(c); 1 SCHNEIDER, Workmen's Compensation 598, 626–28; HOROVITZ, Injury and Death Under Workmen's Compensation Laws 117, 118, 203.

In view of the foregoing, we need not discuss nor decide the second issue raised by appellant: that this was a casual employment, excluded by the Act itself.

The decision of May 10, 1961, ruling that appellant was an uninsured employer and exacting from him pecuniary liability for the accident occurred in this case, is set aside and the record is remanded to the Industrial Commission with instructions to dismiss the proceedings.